## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## DETROIT DIVISION

|  |  |
|---|---|
| Bryan Jackson, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | |
| JPMorgan Chase & Co. & JPMorgan Chase Bank N.A. | **Demand for Jury Trial** **Class Action** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Bryan Jackson ("Jackson" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, Stowell & Friedman, Ltd., hereby files this Class Action Complaint against Defendants JPMorgan Chase & Co. & JPMorgan Chase Bank N.A. (collectively "Chase" or "Defendants") and states as follows:

## JURISDICTION AND VENUE

1.     The claims of Plaintiff and the putative class arise under 42 U.S.C. § 1981, Title VII, and the Michigan Elliot-Larsen Civil Rights Act, and this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331,

1332, and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because a "substantial part of the events or omissions giving rise to the claim occurred" in this District. Chase is licensed to do business and maintains several bank branches in this District and services customers who are residents of this District.

## PARTIES

3.      Plaintiff Bryan Jackson ("Jackson") is a Black man with over two decades of experience in the financial services industry. He resides in Georgia, has years of experience working in Michigan, and applied for a position in Michigan.

4.      Defendant JPMorgan Chase & Co. is a Delaware company headquartered in New York. JP Morgan Chase Bank N.A. is the U.S. retail bank subsidiary of JP Morgan Chase & Co.

## CHASE'S RACIST POLICIES AND PRACTICES

5.      Chase is one of the largest and wealthiest financial institutions in the world. In 2024, Chase earned record revenues in excess of $177 billion. Its market cap is well over $500 billion. Chase currently operates nearly 5,000 bank branches in every one of the lower 48 states.

6.     For decades, Chase has engaged in an unbroken pattern of systemic race discrimination against African Americans, including against its Black customers, employees, and applicants. Its culture of discrimination infects its policies and practices, including those impacting Jackson and the putative class.

7.     Chase has a lengthy history of discriminating against its Black customers for what is known as "banking while Black" including but not limited to in its Consumer & Community Banking segment. For example, a Black customer sued Chase, alleging that Chase called the police on her for sitting in the lobby for a few moments in her local Colorado bank branch to unlock her card before approaching a teller.[1] This type of experience for Chase's Black customers is commonplace and has been the subject of many complaints to Chase and newspaper reports.

8.     Chase has also reduced its physical presence in Black neighborhoods. From 2010–2018, Chase disproportionately closed bank branches in majority-Black neighborhoods as compared to non-Black neighborhoods, regardless of the neighborhoods' income levels. In fact, wealthy majority-Black areas, defined as having a median household income greater than $100,000, were just as likely to

---

[1] Saja Hindi, *"'Banking while Black': Woman sues Chase Bank alleging discrimination at Aurora branch,"* THE DENVER POST (Aug. 11, 2023), https://www.denverpost.com/2023/08/11/aurora-lawsuit-chase-bank-black-woman-discrimination/

lack a Chase branch as low-income non-Black majority areas.[2] And across every income group, Chase closed bank branches in majority-Black neighborhoods at a significantly higher rate than non-Black areas.[3]

9.      Further, both the government and the media have charged Chase with racist mortgage lending practices, targeted at Black customers and prospective customers. In January 2017, Chase paid over $53 million to settle a lawsuit brought by the Department of Justice alleging that Chase had engaged in blatant discrimination by allowing mortgage brokers to charge higher rates to Black and Hispanic mortgage customers than white customers with identical credit profiles. *U.S. v. JPMorgan Chase Bank, N.A.*, 17-cv-00347 (S.D.N.Y.). The Department of Justice alleged that Chase charged African American and Hispanic borrowers higher rates than comparable white borrowers, and that "Chase's pattern of discrimination has been intentional, willful, and has been implemented with

---

[2] *Brown, Menendez Lead Letter Asking JPMorgan Chase To Remember Its Own History When Responding To "Abhorrent" Racial Discrimination*, US SENATE COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS (Dec. 20, 2019), https://www.banking.senate.gov/newsroom/minority/brown-menendez-lead-letter-asking-jpmorgan-chase-to-remember-its-own-history-when-responding-to-abhorrent-racial-discrimination; Zach Fox et. al., *Bank branch closures take greatest toll on majority-black areas*, S&P Global (July 25, 2019), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/bank-branch-closures-take-greatest-toll-on-majority-black-areas-52872925.
[3] *Id.*

reckless disregard for the rights of African American and Hispanic borrowers."[4] The DOJ lawsuit is just one of many lawsuits filed against Chase for discriminatory mortgage lending, and municipalities including Los Angeles and Miami have also sued Chase for its discriminatory lending practices.[5]

10.     In June 2020, WBEZ—Chicago's public radio station—published an exposé on racist lending practices in the mortgage industry.[6] Chase was singled out as a particularly egregious racial redlining offender as among all mortgage lenders, Chase had the widest racial disparity in its lending practices. The study found Chase lent 41 times more money in majority-white Chicago neighborhoods than in Black neighborhoods—meaning that for every dollar Chase lent in majority white neighborhoods, it lent just 2.4 cents in Black neighborhoods. For example, between 2012 and 2018, Chase lent nearly nine times more in a single heavily white Chicago neighborhood (Lakeview) than it lent in all majority Black Chicago neighborhoods combined. In total, less than 2% of the total money Chase lent for

---

[4] *U.S. v. JPMorgan Chase Bank, Inc.*, 17-cv-00347 (S.D.N.Y. 2017), Dkt. 1 ¶ 40, https://www.justice.gov/crt/case-document/file/928586/download.

[5] *LA Sues JPMorgan for Alleged Discriminatory Lending Practices*, Reuters (May 30, 2014), https://www.nbcnews.com/business/business-news/la-sues-jpmorgan-alleged-discriminatory-lending-practices-n118776; Dena Aubin, *City of Miami sues JPMorgan claims mortgage discrimination*, REUTERS (June 16, 2014), https://www.reuters.com/article/us-usa-jpmorgan-chase-discrimination/city-of-miami-sues-jpmorgan-claims-mortgage-discrimination-idUSKBN0ER20R20140616.

[6] Linda Lutton, *Where Banks Don't Lend*, WBEZ (June 3, 2020), https://interactive.wbez.org/2020/banking/disparity/.

home mortgages in Chicago went to Black neighborhoods, the lowest percentage

total for any major bank in the city.[7]

11.    In 2020, following the murder of George Floyd by a Minneapolis

police officer and the ensuing national racial reckoning, Chase, like many other

companies, announced a commitment to racial equity. Aimed at burnishing its

image as a racially progressive company that supports civil rights, Chase engaged

in a PR-focused charm offensive. Chase's CEO Jamie Dimon even "took a knee"

in support of racial justice protesters.

12.    With great fanfare, Chase announced what it called a $30 billion

commitment to "advance racial equity." As part of Chase's sham Racial Equity

Commitment, it created a new position of Community Home Lending Advisors

who would perform essentially the same work as Home Lending Advisors, only

doing so (in theory) to help lower-income and therefore disproportionately

minority communities access home lending.

13.    Chase's Racial Equity Commitment also reached its Consumer &

Community Banking segment. The initiative purported to address financial health

in underserved communities by helping customers open low-cost checking

accounts, hiring additional community managers focused on outreach and

education, and opening Community Center branches including a branch in Detroit,

---

[7] *Id.*

which it touted as being located near the Detroit Police Athletic League's Corner Ballpark.[8]

14.     However, rather than a genuine effort to meet the needs of underserved communities, the Racial Equity Commitment appeared to be a strategy to shuffle Black and Brown applicants for employment into lower earning jobs like the Community Homes Lending Advisor and Community Manager positions to increase Chase's visibility in Black and Brown communities.

15.     Chase's treatment of its Black customers is consistent with its standard operating procedure of discriminating against its Black employees.

16.     Discrimination has also long pervaded Chase's other business segments. For example, in August 2018, a group of Black financial advisors at Chase filed a class action lawsuit, *Senegal v. JPMorgan Chase Bank*, No. 18-cv-6006 (N.D. Ill.), alleging that Chase engaged in widespread, systematic discrimination against its Black financial advisors. The lawsuit alleged that Chase "has and is engaged in an ongoing nationwide pattern and practice of race discrimination and knowingly employs company-wide policies and practices that have a disparate impact on African Americans." The *Senegal* suit alleged that

---

[8] *Chase Expands Community Branches, Local Hiring to Improve Access to Banking and Financial Health*, JPMORGAN CHASE (Apr. 19, 2022), https://www.jpmorganchase.com/newsroom/press-releases/2022/chase-expands-community-branches.

Chase discriminated against Black financial advisors by, among other things:
(a) systematically assigning Black advisors lower-performing bank branches; (b) disproportionately denying Black advisors lucrative "Private Client Advisor" status; (c) implementing compensation practices with the intent and effect of lowering Black advisors' compensation and driving them out of the company; and (d) denying Black advisors opportunities for advancement to management.

17.     Chase and the *Senegal* Plaintiffs entered into a settlement agreement which received court approval. The settlement agreement included wide-ranging programmatic relief, designed to uproot the discrimination faced by Black financial advisors at Chase. Among other things, the settlement agreement required Chase to: (a) engage in a systematic review of its branch assignment practices; (b) assemble a high-level committee that would meet regularly "with the objective of increasing the number of [] Black Advisors and increasing [] Black Advisor productivity and retention"; (c) implement coaching and career training for Black advisors; (d) invest in recruitment aimed at hiring Black advisors; (e) implement programs designed to increase Black representation in management.

18.     As part of the *Senegal* settlement, Chase agreed to pay $24 million to be distributed to Black financial advisors.

19.     Recently JP Morgan Chase Bank N.A. was also fined by the State of California's Civil Rights Department for failing to file required pay data reports on

the gender and ethnic and racial breakdowns of its employees for its 900 bank branches in California.[9] These reporting requirements were enacted to help the State detect pay discrimination, and Chase attempted to evade these requirements until the California Civil Rights Department filed a suit to force its compliance.

20.     As Chase's CEO Jamie Dimon admitted candidly, the Firm's effort to attract, retain, and promote Black employees "simply is not good enough."[10]

21.     In fact, as of December 2023, only 5% of Chase's executive and senior level employees were Black[11] as opposed to over 14% of the U.S. population.

22.     In 2021, Chase, along with other banks, came under shareholder pressure to increase its diversity practices.[12]

---

[9] *California Civil Rights Department Settles with JPMorgan Chase Bank N.A., Michaels Stores Over Failure to File Pay Data Reports*, STATE OF CALIFORNIA, CIVIL RIGHTS DEPARTMENT (Sept. 2, 2022), https://calcivilrights.ca.gov/2022/09/02/california-civil-rights-department-settles-with-jpmorgan-chase-bank-n-a-michaels-stores-over-failure-to-file-pay-data-reports/.

[10] Leah Fessler, *JPMorgan's CEO admits his company has a black talent problem—and the finance industry should listen*, QUARTZ MEDIA (Apr. 6, 2017), https://qz.com/951064/jpmorgan-chases-ceo-jamie-dimon-admits-to-diversity-problems-with-black-talent-in-his-2017-letter-to-shareholders.

[11] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/2023-workforce-composition-disclosure.pdf

[12] Ben Eisen, *Biggest U.S. Banks Embrace 'Rooney Rule' Policies in Diversity Hiring Push*, WALL STREET JOURNAL (Jan. 26, 2021), https://www.wsj.com/finance/banking/biggest-u-s-banks-embrace-rooney-rule-policies-in-diversity-hiring-push-11611686889

23.    A Chase spokesperson announced that in response to this shareholder pressure, it was "happy to agree to publicize our important practice" of utilizing diverse slates that include at least one woman and one person of color as candidates.[13]

24.    Using a diverse slate allowed Chase to create the appearance of diversity while in reality maintaining the status quo. Unsurprisingly, with the use of diverse slates, Chase did not increase the presence of Black and Brown employees in leadership roles. In fact, from 2020 to 2023, the percentage of Chase's workforce that it identified as Black remained stagnant at just over 13%, and those who identified as Black and worked in senior management roles remained stagnant at just about 5%.[14] Further, Chase's operating committee is overwhelmingly white.

---

[13] *Id.*

[14] Compare data from JP Morgan Chase's 2020 Employer Report (https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/2020-jpmc-consolidated-eeo-1-report.pdf) to the data from the 2023 document (https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/2023-employee-information-report.pdf).



25.     And now that performative virtue-signaling regarding racial equity is

no longer in vogue, Chase has stepped back from even its faux commitment to

diversity. Dimon has recently explained that to Chase, equity means "equal treatment, equal opportunity, and equal access . . . not equal outcomes."[15]

26.     Even worse, it has been reported that Dimon's colleagues say he calls himself, "the least woke person you will ever meet."[16]

27.     Chase has announced that its Racial Equity Commitment is now wrapping up.[17] While Chase purports that it's because it spent the $30 billion in funding for its Racial Equity Initiative, the true reason is that it is no longer necessary or fashionable to be equitable. The discrimination that Chase has long fostered is now acceptable again.

28.     Similarly, once the terms of the *Senegal* settlement expired, Chase also reduced even the appearance of any genuine efforts to increase diversity among its employees. Chase executives stated that they could now decrease their efforts to increase diverse head count and representation.

29.     Recently, Dimon has been more candid in admitting that the Firm's commitment to its DEI practices was merely performative when a taped conversation was leaked to the press in which Dimon derided the Firm's DEI

---

[15] Charles Gasparino, *Jamie Dimon may not see it, but JPMorgan has a glaring 'woke' blind spot*, NEW YORK POST (Sept. 14, 2024), https://nypost.com/2024/09/14/business/jamie-dimon-may-not-show-it-but-jpmorgan-has-gone-woke/.
[16] *Id.*
[17] Ruth Umoh, *JPMorgan says its $30B racial equity pledge is nearly complete and will become a part of the bank's business*, FORTUNE (Apr. 10, 2024), https://finance.yahoo.com/news/jpmorgan-says-30b-racial-equity-141254940.html.

efforts: "I saw how we were spending money on some of this stupid sh-t, and it really pissed me off. . . I'm just gonna cancel them. I don't like wasted money in bureaucracy."[18]

## CHASE'S DISCRIMINATION AGAINST JACKSON AND THE CLASS

30.     Plaintiff Bryan Jackson has over two decades of experience in the financial services industry leading consumer banking branch regions and markets, and banking and credit card call centers. He received his bachelor's degree in consumer economics from the University of Delaware.

31.     Jackson is exceptionally experienced and skilled in executive leadership, having served in various leadership roles at Bank of America from 2001 to 2023. From approximately 2007 to 2017, Jackson was a Consumer Bank Market Leader in Atlanta, Georgia and Bergen/Essex County, New Jersey. In this position, Jackson managed Financial Center Managers and Relationship Managers across 33 financial centers. Jackson was responsible for promoting balanced performance. Indeed, his regions consistently ranked in the top 25% of Bank of America Regions for balanced performance, and Jackson received numerous accolades and commendations as a top leader at Bank of America.

---

[18] Amanda Gerut, *JPMorgan CEO Jamie Dimon wants to cancel some DEI spending after the bank spent billions on racial equity: 'I was never a firm believer in bias training,'* Fortune (Feb. 14, 2025), https://fortune.com/2025/02/14/jpmorgan-ceo-jamie-dimon-dei-bias-training-spending-racial-equity/.

32.    Due to his success as Consumer Bank Market Leader, Jackson was promoted to the position of Consumer Banking Regional Operations Executive for the Georgia and Tennessee region where he served from approximately 2017 to 2021. Jackson was responsible for managing consumer bank operations, integrated business performance, and capacity planning for over 200 financial centers across his region. Jackson was responsible for 1.3 million consumer and small business households, and he managed over $150 billion in total deposits. Under Jackson's leadership, his region generated over $150 million annually.

33.    From approximately 2021 to 2022, Jackson worked as the Retail Consumer and Small Business Preferred Banking Executive in the Michigan region. Jackson was responsible for leading a team of Consumer Bank Market Leaders, Branch Managers, Operation Managers, Sales Managers, and Business Support partners across the entire Michigan region.

34.    On May 14, 2024, a white Executive Recruiter for Chase's Consumer & Community Banking and Asset & Wealth Management segments reached out to Jackson through LinkedIn. She asked Jackson to meet and discuss a managing director / regional executive opportunity for the Michigan Region of Chase's Consumer Banking which covered over 200 financial centers. Jackson was well qualified for this position due to his experience in executive leadership. In fact, this

position was functionally identical to Jackson's prior position in the Michigan region for Bank of America.

35.     At the time the recruiter contacted Jackson through LinkedIn, his LinkedIn profile picture confirmed that he is Black:



36.     Jackson spoke to the recruiter over the phone on May 17, 2024, when she said that Jackson was Chase's "first priority for contact," or words to that effect. She told Jackson that the hiring manager was eager to meet him. Despite the recruiter's feigned enthusiasm, Jackson slowly realized throughout the interview process that he was never seriously considered for the position.

37.     On this May 17, 2024 call, the recruiter told Jackson that he did not have to submit an application or a resume. Jackson has been a candidate for many positions at many different companies, and this was the first time he was told that

he did not need to complete an application or a resume. This was the first among many signs that Chase did not take Jackson seriously as a candidate. Without the application, Chase would be able to have a record that they interviewed a Black candidate without having on record that the Black candidate was qualified for the job.

38.    Jackson had an interview scheduled with a white woman on June 4, 2024. However, around an hour before the interview, her office sent an email saying that she confused the times and would not make it. Jackson offered to reschedule until a time she was available, but she declined. A white man took her place and interviewed Jackson.

39.    The man clearly did not take Jackson or the interview seriously. From what Jackson observed during the interview, he did not take any notes and did not ask follow-up questions, and there was very little back and forth dialogue. Overall, his behavior and closed-off demeanor gave the impression that he was not listening to a word Jackson said. Throughout the interview, he constantly mentioned that he was in a rush, ending the interview after just half an hour.

40.    Jackson has decades of experience interviewing for various roles in the banking industry, and he never had an interview that felt so one-sided and unprofessional. Before this interview with Chase, every person who interviewed Jackson took notes, asked follow-up questions, and was significantly more

responsive to Jackson's answers. Additionally, Jackson had never had an interview that lasted under one hour.

41.     This interview was understandably demoralizing for Jackson, but Jackson tried to remain optimistic because he had a second interview with the woman he was originally scheduled with on June 18, 2024. Since this woman was originally supposed to interview Jackson, he hoped that she would be more responsive and engaged than the man he interviewed with who was a last-minute replacement.

42.     The tone this second interview was just as cold as the first. As with the first interviewer, this interviewer took no notes, asked few follow-up questions, and generally acted disinterested throughout the roughly 30-minute interview. The one-sided nature of this interview confirmed what Jackson had already suspected: Chase never seriously considered Jackson for the position.

43.     On June 21, 2024, the recruiter emailed Jackson to advise him that, while the interviewers had positive feedback and appreciated Jackson's leadership style, Chase would be prioritizing other candidates. Specifically, the recruiter stated they would prioritize candidates who led regions similar in complexity and scale to the Michigan region. As mentioned, Jackson led the Michigan region at Bank of America in a position functionally identical to the Chase position.

44.     In contrast to its stated position, Chase ultimately hired a white male with experience managing only a small portion of the region in a role that would have reported to Jackson in his previous position at Bank of America.

45.     This hire was contrary to Chase's written statement about prioritizing candidates with experience similar in complexity and scale to the Michigan region.

46.     Rather than stick to their intentions, they hired a white man and internal candidate who had been a Wealth Management Market Director and oversaw only a section of Michigan, the Grand Rapids region of 200,000, as opposed to Michigan's total population of 10 million. In contrast, Jackson had managed similar operations at Bank of America for all of Michigan.

47.     After Jackson found out that he was passed over in favor of a white man, he looked into the hiring manager's hiring record at Chase. Unsurprisingly, almost all of the hiring manager's previous hires had been white, including but not limited to the two individuals who interviewed Jackson and the hired candidate.

48.     Jackson invested substantial time and energy in preparing for the interviews, and shared with friends and family members the hope of a prospective new job.

49.     Chase's treatment of Jackson appears to be part of an insidious practice of fake interviews. Fake interviews occur when a company wants to appear to honor diversity but does not have a genuine commitment to diversity.

Just like Chase's stated practice, a company will interview a "diverse" candidate (either an internal or external candidate), including a Black candidate, but will have little or no intention to hire that person. Often, the actual hiring decision is made before any interviews are conducted, and the pre-selected candidates are personally connected to those hiring them.

50.    Fake interview practices like Chase's harm Black candidates. Such a practice causes Black candidates to spend an enormous amount of time and energy studying, preparing, and sitting for interviews where there is little intention of actually hiring them. Many candidates travel and take off work for interviews, and others share with friends and family members the hope of a prospective new job. In other words, this practice is extremely demoralizing and damaging to the careers of the individuals subjected to this practice.

51.    Further, these practices will invariably have a disparate impact on Black candidates because they require interviewers to have one "ethnically diverse" candidate for every position. So, if a hiring manager wants to hire a white candidate, they will conduct fake interviews of a Black or other "ethnically diverse" individuals but not any white candidates.

52.    Jackson files this action to hold Chase accountable for its racial discrimination against Jackson and others similarly situated to him.

53.    Upon information and belief, the intentional and disparate impact discrimination described above is ongoing and constitutes a continuing violation of the civil rights laws.

54.    As a direct and proximate result of Chase's discrimination, Jackson and all others similarly situated have suffered financial losses.

55.    As a direct and proximate result of Chase's discrimination, Jackson and all others similarly situated have suffered emotional and mental distress, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

56.    The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of the rights of Plaintiff and all others similarly situated. Plaintiff and the class are, thus, entitled to recover punitive damages from Chase.

## CLASS ALLEGATIONS

57.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of Black candidates—both internal and external candidates to Chase—who were subjected to discrimination through fake interviews by Chase due to their race. All requirements of class certification are met by the proposed class.

58.     The class of Black interviewees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

59.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

60.     The claims alleged by Plaintiff are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

61.     Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

62.     The proposed class meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

63.     The issues of determining liability and injunctive and equitable relief, among other issues, are also appropriate for issue certification under Rule 23(c)(4), as are other common issues.

64.     Common issues include whether Chase engages in an unlawful policy or practice of seeking Black candidates to interview with little intention to hire

them for the purpose of fulfilling an internal policy without disclosing that purpose to the candidates.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981 (Plaintiff and Class)

65. Plaintiff, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

66. 42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The words "make and enforce" contracts include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

67. Chase maintains a nationwide set of uniform, discriminatory practices and engaged in a pattern or practice of systemic race discrimination against Black employees that constitutes illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

68. Through the conduct alleged herein, Chase denied Plaintiff and the other Black interview class members opportunities and benefits that were offered to similarly situated white interviewees.

69.    Plaintiff and all those similarly situated were subjected to and harmed by Chase's systemic and individual discrimination.

## COUNT II

### RACE DISCRIMINATION
### IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq*.
### (Plaintiff and Class)

70.    Plaintiff, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

71.    Jackson filed a representative charge of racial discrimination with the Equal Employment Opportunity Commission and exhausted his administrative remedies and received a Notice of Right to Sue.

72.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

73.    By its conduct as alleged herein, Defendant unlawfully discriminated against Jackson and all those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

74.    Plaintiff and other Black candidates subjected to fake interviews were harmed by the Defendant' conduct.

## COUNT III

## RACE DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT 453 OF 1976
### (Plaintiff and Michigan Class)

75.    Plaintiff, individually and on behalf of all others similarly situated, was subjected to and harmed by Chase's systemic and individual discrimination.

76.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

77.    The Michigan Elliott-Larsen Civil Rights Act 453 of 1976 makes it an unlawful employment practice for an employer to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" because of race.

78.    Chase unlawfully racially discriminated against Plaintiff in violation of MCL 37.2202 Section 202. As set forth above, among other things, Chase subjected Black candidates to fake interviews with little or no intent of hiring them for positions.

79.    Plaintiff challenges Chase's actions based on disparate treatment and disparate impact theories of liability. As set forth above, Plaintiff was negatively

affected by Chase's national and uniform policies and practices that had a disproportionate adverse effect on Black interviewees at Chase, including Plaintiff.

80.    As a direct, foreseeable and proximate result of Defendant's conduct, Plaintiff and all those similarly situated have incurred and will continue to incur damages in an amount to be proven at trial.

81.    The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiff's rights. Plaintiff and all those similarly situated are thus entitled to recover punitive damages from Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, and all others similarly situated, respectfully requests that this Court find in their favor and against Chase as follows:

a.    Certify this case as a class action, including a disparate treatment and disparate impact class of Black interviewees (both internal and external candidates) who were denied a position at Chase;

b.    Designate Plaintiff as Class Representatives and designate Plaintiff's counsel of record as Class Counsel;

c.    Declare that Chase's acts, conduct, policies, and practices are unlawful and violate 42 U.S.C. § 1981, Title VII, and The Michigan Elliott-Larsen Civil Rights Act 453 of 1976;

d.    Enjoin Chase from further unlawful conduct;

e.      Award Plaintiff and all others similarly situated compensatory

        damages, liquidated damages, and exemplary damages;

f.      Award Plaintiff and all others similarly situated lost wages,

        compensation, and benefits in an amount to be proven at trial and that

        make Plaintiff whole;

g.      Award Plaintiff and all others similarly situated damages for non-

        monetary harm he has suffered, including but not limited to emotional

        distress;

h.      Award Plaintiff and all others similarly situated prejudgment interest,

        costs, and disbursements, as provided by law;

i.      Award Plaintiff and all others similarly situated punitive and

        liquidated damages;

j.      Award Plaintiff and all others similarly situated reasonable attorneys'

        fees and costs of litigation;

k.      Award Plaintiff and all others similarly situated such other relief as

        the Court deems just and proper.


Dated: December 10, 2025              Respectfully submitted,



                                      By:    */s/ Jennifer S. Gilbert*

Jennifer S. Gilbert
(Admitted in the Eastern District of Michigan)
IL Bar No. 6275865
jgilbert@sfltd.com

Linda D. Friedman
IL Bar No. 6190092
lfriedman@sfltd.com

George S. Robot
IL Bar No. 6237979
grobot@sfltd.com

STOWELL & FRIEDMAN, LTD.
303 W. Madison Street
Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888